UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

CARRY BLUNT,

                                        Petitioner,

            vs.                                              9:01-CV-1619
                                                             (J. Hurd)

SUPERINTENDENT
EISENSCHMIDT,

                                        Respondent.

_____

APPEARANCES                              OF COUNSEL

CARRY BLUNT
99-B-0106
Petitioner pro se
Clinton Correctional Facility Annex
P.O. Box 2002
Dannemora, New York 12929

ELIOT SPITZER                            PATRICK F. MACRAE
Attorney General of the                  Asst. Attorney General
State of New York
Attorney for Respondent
615 Erie Boulevard West, Suite 102
Syracuse, New York 13204

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

    This matter has been referred to me for Report and Recommendation by the

Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. §

636(b) and Local Rules N.D.N.Y. 72.3(c).

Petitioner has brought this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner complains of a judgment of conviction of the Onondaga County Court, entered on January 8, 1999, after a jury found petitioner guilty of two counts of Criminal Sale of a Controlled Substance, First Degree; one count of Criminal Possession of a Controlled Substance, First Degree; two counts of Criminal Possession of a Controlled Substance, Second Degree; and two counts of Criminal Sale of a Controlled Substance, Third Degree, upon which he was sentenced to a term of fifteen years to life imprisonment.

Petitioner moved to vacate his conviction in Onondaga County Court pursuant to N.Y. CRIM. PROC. LAW § 440.10. The County Court judge denied the motion on November 1, 1999. On February 7, 2001, the Appellate Division, Fourth Department affirmed petitioner's conviction and the denial of his section 440.10 motion. *People v. Blunt*, 280 A.D.2d 956, 721 N.Y.S.2d 199 (4th Dep't 2001); *People v. Blunt*, 280 A.D.2d 957, 719 N.Y.S.2d 918 (4th Dep't 2001). The New York Court of Appeals denied leave to appeal on May 23, 2001. *People v. Blunt*, 96 N.Y.2d 826, 729 N.Y.S.2d 446, 754 N.E.2d 206 (2001).

Petitioner raises four claims in this habeas petition:

1.      The prosecutor engaged in the discriminatory use of peremptory challenges in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).

2.      The prosecutor failed to correct false and misleading testimony by one of his witnesses.

3.      Petitioner was denied the right to be present at sidebar interviews of prospective jurors.

4.      The trial court failed to properly instruct the jury that they should not talk about the case among themselves or with anyone else.

Respondent has filed his answer, together with the pertinent state court records[1] and a memorandum of law. (Dkt. Nos. 8, 9).  Respondent argues for denial of the petition both based on the merits and on procedural default.  For the following reasons, this court agrees that the petition should be dismissed.

## DISCUSSION

## 1.      <u>Facts</u>

The petitioner's conviction in this case arose from two incidents in which he was involved in the sale of cocaine to Jonnie Cole, an individual who was an informant for the Syracuse Police.  The first sale occurred on February 6, 1997 and was conducted though a co-defendant intermediary, Allyn Perry.[2]  Mr. Perry delivered the drugs to Jonnie Cole and brought the money back to petitioner. The second sale occurred on April 10, 1997 and was made directly to Mr. Cole by

---

[1] The state court records are listed on page 2 of respondent's answer. (Dkt. No. 8).

[2] It appears that the proper spelling of Mr. Perry's first name is "Allyn."  It is occasionally spelled "Alan" and occasionally spelled "Allen" in the record, but the court will refer to Mr. Perry by the proper spelling of his first name.

3

petitioner, using buy-money supplied by the police.

Both Jonnie Cole and Allyn Perry testified for the prosecution. The police officers who set up the purchases also testified. David Procopio, a detective in the Narcotics Division of the Syracuse Police Department testified that on February 6, 1997, the police set up a purchase of three ounces of cocaine from Allyn Perry, utilizing Mr. Cole as the buyer. (T. 372). Mr. Cole was searched, given $ 2,400.00, wired with a body microphone, and instructed to make the cocaine purchase from Allyn Perry, but also to ask to meet petitioner in order to make the actual payment for the drugs. (T. 373-75). Mr. Perry worked at the Perkins Restaurant in DeWitt, New York, and Mr. Cole arranged to meet Mr. Perry at Perkins. (T. 372, 374-75). The officers had "surveillance booths" outside the restaurant and had officers inside the restaurant. (T. 375).

The officers observed Cole enter Perkins Restaurant and exit a short time later, accompanied by Perry. (T. 375). Cole and Perry got into Cole's car, and a short time later, Perry got out of the car and went back into the restaurant. (T. 376). Cole then drove back to the Town of DeWitt Police Department, followed by Detective Procopio. (T. 377). When Cole arrived at the police department, he gave Detective Procopio a clear plastic bag containing cocaine. (T. 377). Mr. Cole also still had the money that he had been given earlier. (T. 379). Subsequently, the

4

surveillance was moved to petitioner's residence, and the buy-money was returned to Mr. Cole so that he could go and meet petitioner to pay for the transaction that had been made with Mr. Perry. (T. 380-81).  Mr. Cole, still wearing the body wire, drove to petitioner's residence, went in to meet him, and ultimately paid for the drugs. (T. 382).  Detective Procopio testified that Mr. Cole did not have the buy-money when he left petitioner's residence. (T. 382-83).  Video and audio tapes were made of the entire transaction, both at Perkins and at petitioner's residence. (T. 414-19) (testimony of Detective Norm Doyle, Onondaga County Sheriff's Department, Technical Surveillance Unit).

Jonnie Cole testified that he had been arrested for selling cocaine, was given the option to cooperate with the police, and decided to cooperate by assisting the police in arresting other drug dealers. (T. 427-29).  Mr. Cole had purchased cocaine from Allyn Perry on a prior occasion in 1996, and then arranged to purchase more cocaine from Mr. Perry on February 6, 1997. (T. 429-30).  Mr. Cole then testified to the transactions that occurred between him, Mr. Perry, and petitioner on February 6, 1997. (T. 433-37).

Mr. Cole testified that he and Mr. Perry got into Mr. Perry's car, and Perry gave Cole the three ounces of cocaine. (T. 431).  At that time, Mr. Cole asked Perry if Cole could give the money directly to petitioner, and Mr. Perry told Cole that he

5

should go to petitioner's residence with the money. (T. 431).  Cole also testified

that he went to petitioner's house and gave the money for the drugs directly to him.

(T. 435).  Cole also testified that he asked petitioner if the next time Cole purchased

drugs, he could "leave Allyn out of the deal, and deal with [petitioner] directly." (T.

436).  Petitioner agreed that it would not be a problem. (T. 436).

Mr. Cole also testified that on March 27, 1997, he arranged to purchase six

ounces of cocaine directly from petitioner. (T. 563).  Mr. Cole stated that he went to

Car Creations in DeWitt, New York and met petitioner, who placed nine ounces of

cocaine in Cole's pocket instead of the six ounces that Cole had asked to purchase.

(T. 566-68).  Cole told petitioner that he had $ 2,300.00 with him and would have to

pay the rest at a later date. (T. 567).  Once again, the transaction was recorded, and

the recording was played for the jury. (T. 569-70).  Mr. Cole testified that on April

10, 1997, he met with petitioner to pay him the rest of the money for the March 27,

1997 purchase. (T. 640).  Mr. Cole stated that he drove over to petitioner's house

and gave him the money directly. (T. 640-41).  Apparently, Mr. Cole did not have

the full amount, so he told petitioner that he would need the weekend to get the rest

of it. (T. 641).  Once again, the entire transaction was audio-taped by Mr. Cole

wearing a portable tape recording device, and the audio tape of Mr. Cole's and

petitioner's conversation was played for the jury. (T. 661).

6

2.    **Standard of Review**

The standard of review in a habeas action depends upon whether the state court considered petitioner's constitutional claims "on the merits."  The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that a federal court lacks the power to grant a writ of habeas corpus under 28 U.S.C. § 2254 unless the state court ruling ***on the merits*** of a federal constitutional issue was either "'contrary to ... clearly established Federal law' or 'involved an unreasonable application ... of clearly established Federal law.'" *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir. 2001)(quoting 28 U.S.C. § 2254(d)(1))(alterations in original).  The statute further provides that the court may grant a writ of habeas corpus when a claim that was considered on the merits by the state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Prior to the AEDPA, the court was not required to defer to state court determinations on pure questions of law and mixed questions of law and fact. *Thompson v. Keohane*, 516 U.S. 99, 107-13 (1995).  When presented with these questions, the court was empowered to conduct an independent review of the record. *Id.*  The factual findings of the state court, however, were presumed to be correct absent circumstances listed in the statute, such as cases in which the factual

finding was not fairly supported by the record.  28 U.S.C. § 2254(d) & (d)(8).  The

AEDPA requires the court to apply a more deferential standard, placing new

restrictions on the power of federal courts to grant writs of habeas corpus to state

inmates. *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

In order to apply the AEDPA standard, the petitioner's claim must have been

"adjudicated on the merits" in the State court proceedings. 28 U.S.C. § 2254(d)(1).

Additionally, the AEDPA provides that a state court's fact findings are presumed

correct, unless that presumption is rebutted by clear and convincing evidence. *Id.*

§ 2254(e)(1).  If the State court has failed to adjudicate a claim "on the merits", the

pre-AEDPA standard of review applies, and the court reviews both questions of law

and mixed questions of law and fact *de novo. Washington v. Shriver*, 255 F.3d 45,

55 (2d Cir. 2001).

**3.  *Batson* Claim**

Petitioner raised this claim on direct appeal from his conviction, and the

Appellate Division clearly analyzed the claim on the merits. *People v. Blunt*, 280

A.D.2d at 956-57, 721 N.Y.S.2d at 200.  Petitioner also raised the claim in his

application for leave to appeal, thus, this court must apply the AEDPA standard to

petitioner's claim.

The Supreme Court has articulated a three-pronged test for evaluating claims

that a petitioner was denied equal protection when peremptory challenges have been used to exclude potential jurors based on race. *Batson v. Kentucky*, 476 U.S. 79 (1986).  Under *Batson*, the trial court must first decide whether the defendant has made a *prima facie* showing that the prosecutor has exercised a peremptory strike on the basis of race. 476 U.S. at 96-98.  If the court finds that a *prima facie* showing has been made, the prosecutor must come forward with a race-neutral explanation for striking the potential juror. *Id.*  If the court finds that the prosecutor has met his or her burden of coming forward with a race-neutral explanation, then the court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.*

In this case, petitioner argues that the prosecutor used a peremptory challenge to exclude the last African-American person who could have been selected for his jury and therefore, engaged in discriminatory use of his peremptory challenges.  A review of the transcript of the jury selection shows that there were several rounds of jurors seated and questioned by the court, the prosecutor, and defense counsel. There were no African-Americans seated in the first round because the prosecutor noted this during his presentation. Trial Transcript (T) at 51.[3]

---

[3] The trial transcript is contained in the Record on Appeal.  There are some pages of the Record on Appeal that appear prior to the trial transcript itself, and include the indictment and some short pretrial court appearances, and they are designated as pages 1A-62A.  The trial

The prosecutor mentioned this because he wanted to make sure that this fact would not affect the jurors in any way, and the prosecutor stated that even though there were no African-American jurors seated at that time, and if there were no African-American jurors seated at all, it should not affect the way the jury decided the case. (T. 51-52). The prosecutor specifically stated that there was "no room for prejudice in this Court Room or the Jury." (T. 51-52). The prosecutor then stated that it should be the same if all of the jurors were African-American. (T. 52).

Two of the jurors that were excused in the first round were excused for cause because they had family members who had been involved as defendants in criminal cases, and one juror stated that she believed her relative had received unfair treatment by the District Attorney. (T. 79, 102). The other juror had a nephew who was charged with drug offenses, similar to the petitioner in this case. (T. 94-95, 102).

In the next round of jurors, there were two individuals excused by the court. The race of the individuals was not stated, but one was excused after a conference with the court that was not recorded at the individual's request. (T. 114). After another bench conference, the second individual stated that he could absolutely ***not***

---

transcript, however begins on page 1 and continues sequentially thereafter. The pages to which this court refers are the same as the original pages of the transcript.

vote guilty in petitioner's case. (T. 118).  The court excused this man also. (T. 118).

A woman in the second round of jurors also stated that she had a nephew, who she

raised, facing similar charges to petitioner. (T. 109-110).  She stated that she had

reason to be more sympathetic to the defendant, and that she did not really know if

she could be fair to the prosecutor. (T. 110-11).  This woman's race is unknown,

however, the court excused her. (T. 111).

In the third round of jurors, one of the individuals stated that he knew the

defendant, that the prosecutor in petitioner's case had prosecuted the man's nephew

on drug charges, and that when he first walked in the room, he knew that he was not

going to vote against petitioner. (T. 178-82).  When the court excused this juror,

defense counsel objected and stated that this person was the "last black person in

the Jury pool, and ... we don't have any more black jurors in the room." (T. 182).

One of the women in the third round of jurors commented that she had an

issue because the jury was not of petitioner's "peers." (T. 207-208).  The prosecutor

asked the woman what effect did she think that would have on her decision, and she

said that she was not sure. (T. 208).  The prosecutor then reminded her that the

judge would tell all the jurors that there should be no prejudice for or against

anyone in their decision, and asked if she could follow that instruction. (T. 208).

She stated that she could. (T. 208).

Petitioner's issue arose in the fourth round of jury selection.  One of the prospective jurors was an African-American woman.  She stated that she was a Social Psychologist, had a degree in Clinical Psychology, and was about to receive a degree in Sociology. (T. 316-17).  She initially stated in response to the prosecutor's questions that although she had "feelings" about drugs, she had no problem being a juror. (T. 318).  The prosecutor then moved on to question another juror. (T. 318).

During questioning by defense counsel, he asked a general question if "anyone" was bothered by the fact that they had some feelings about drugs. (T. 324).  Counsel did not direct the question at any particular juror. *Id.*  The woman who was a psychologist answered that she did have feelings, and continued to state that she did not want drugs in her community, that she did not want children falling behind in school, that she did not

> like people get [sic] on the stand and lying for their own benefits [sic], and all around, and I don't like it, and Afro American males, yes, I do have feelings about it, and I would not be an Afro American woman in this community as a sociologist if I did not have these feelings and express them to you.  However, I am a professional as well, and so I feel I could sit here and be impartial as well.  Understand burden of proof and all other concepts that go with it.

(T. 324-25).  Later, the prosecutor exercised a peremptory challenge to exclude this

individual. (T. 328-29).  Defense counsel objected, stating that every other black person had been excused for cause, and that this person was the last possible African-American for the jury. (T. 328-29).

Defense counsel then stated that he was challenging the exclusion of this person from the jury. (T. 330).  Defense counsel argued that the prosecutor had not raised a legitimate reason for exclusion of the juror, because she stated that she could be fair and impartial in the case. (T. 330).  The prosecutor then stated that there had been no pattern of exclusion, and the other African-Americans had been excused for cause, because of their situations, and noted that there were non-African-Americans that were excused for cause for the same reasons. (T. 331).

The prosecutor then stated two reasons for his peremptory challenge.  The first reason was the juror's "statement to Mr. Carey,"[4] and the second reason was because "she got a doctorate in Psychology, Clinical Psychology, and my experience with that, these people have ... I prefer not to have on the jury." (T. 330).  The trial court judge stated that he "would accept that reason." (T. 331).  The court assumes that the prosecutor's first reason for the peremptory was referring to the prospective juror's statement to Mr. Carey quoted above since that was the only "statement" made to defense counsel by this juror, and was in response to Mr.

---

[4] Defense counsel was Paul Carey, Esq.

Carey's general question to the prospective jurors.

The statement that this prospective juror made showed that she did have strong feelings, additionally, she stated that she did not like people getting on the stand and "lying" for their own benefit.  Mr. Carey had asked earlier if people who testified in exchange for receiving favorable treatment by the prosecutor might be "capable of lying to benefit themselves." (T. 324).  A prospective juror answered "yes." (T. 324).  It is unclear who that prospective juror was, but the clinical psychologist's statement to Mr. Carey was the next thing in the transcript.  When this prospective juror stated that she did not like people lying for their own benefit, the prosecutor could have been concerned since two of his witnesses were getting favorable treatment for their testimony.  The prospective juror's statement to Mr. Carey could have caused the prosecutor concern that she had already decided that these people might be lying, and that she might not be keeping an open mind, notwithstanding her subsequent statement that she could be fair and impartial.

Certainly, a decision based on the juror's occupation is a race-neutral reason for using a peremptory challenge.  The prosecutor stated that he preferred not to have Clinical Psychologists on the jury.  This court would also point out that the

prosecutor exercised a peremptory challenge to exclude a non-African American[5] prospective juror who had a Master's Degree in Social Work. (T. 334, 337).  This prospective juror had also stated that she had a friend of the family who had been the victim of a robbery, but that it would not affect her ability to sit as a juror. (T. 336).  Thus, the finding that the prosecutor articulated race-neutral reasons for his challenge has not been rebutted by clear and convincing evidence.

Petitioner does not argue that step one or step two of *Batson* are at issue in this case.  Petitioner argues that the trial court judge failed to reach the ***third*** step of *Batson*.  This court notes that the Supreme Court has stated that *Batson* rulings do not require a detailed explanation. *Miller-el v. Cockrell*, 537 U.S. 322, 347 (2003). *See also Galarza v. Keane*, 252 F.3d 630, 640 n.10 (2d Cir. 2001)(general crediting of a race-neutral explanation will normally suffice).  In *McKinney v. Artuz*, 326 F.3d 87, 101 (2d Cir. 2003), the Second Circuit found that the trial judge's statement that he was going to seat the juror "'over the defense's objection'" constituted an "express ruling" at step three.  The court in *McKinney* also found that the trial judge made an express ruling on another juror by stating that "'I see no reason why the juror should not be seated.'" *Id.*

---

[5] The court assumes that this individual was not African American because defense counsel lodged no objection to this peremptory challenge, and it was not mentioned in this habeas action.

Although the trial court judge in this case did not specifically articulate *why* he accepted the prosecutor's reason, the judge did specifically state that he accepted the reason. (T. 331).  By "accepting" the prosecutor's reason and excusing the juror, clearly, the trial court judge found that the prosecutor's race-neutral reason was not pretextual.  Thus, contrary to petitioner's argument, the trial court did make a ruling at step three for *Batson* purposes, and the Appellate Division's decision upholding the trial court is not contrary to, nor was it an unreasonable application of federal law under the AEDPA.  Petitioner's first claim may be dismissed.

**4.     <u>Prosecutorial Misconduct</u>**

Petitioner claims that the prosecutor failed to correct false testimony by one of his witnesses.  During oral argument of petitioner's pre-trial motions, defense counsel mentioned that he had heard that Allyn Perry, petitioner's co-defendant was going to cooperate with the prosecution. Record on Appeal 24A-25A.  Defense counsel asked for any statements by Perry. *Id.*  In open court, the prosecutor stated that Mr. Perry had pled guilty and would be sentenced to either six to life or ten to life. Record on Appeal 25A.  Part of Mr. Perry's plea agreement was that he cooperate with the prosecutor's office. *Id.*  The prosecutor then stated that he had not spoken with Mr. Perry yet, but that when he did, if there were any notes generated, he would turn them over to defense counsel. *Id.*

16

Petitioner argues that on cross-examination of Mr. Perry at trial, he lied about obtaining a "benefit" in exchange for testimony favorable to the prosecution. Petitioner also argues that the prosecutor allowed this "lie" to stand uncorrected and thus committed constitutional error.  Petitioner raised this claim on appeal, and although the Appellate Division did not include an analysis of this issue, the court clearly stated that petitioner's remaining contention was "without merit." 280 A.D.2d at 957, 721 N.Y.S.2d at 200.  Thus, the AEDPA standard applies.

A federal court's review of a prosecutor's action on habeas corpus is very limited.  Petitioner must prove that he suffered ***actual prejudice*** such that the prosecutor's misconduct "had a substantial and injurious effect or influence in determining the jury's verdict." *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994), *cert. denied*, 516 U.S. 1152 (1996); *see also Brecht v. Abrahamson*, 507 U.S. 619, 637 (1992).  In evaluating whether petitioner has met his burden, three factors are relevant: (1) the severity of the prosecutorial misconduct; (2) any curative measures adopted to cure the misconduct; and (3) the certainty of conviction absent the misconduct.  *See id.*; *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998).

Petitioner argues that the prosecutor stated during pre-trial motions that the petitioner was receiving a beneficial sentence in exchange for his cooperation. (RA at 25A).  The prosecutor's exact words were that " ... so the record is clear, Mr.

Perry pled with a range of six to life to ten to life.  Part of his plea agreement was that he cooperate with our office." *Id.*  On direct examination at the trial, Mr. Perry testified that he had been arrested for "Possession of a Controlled Substance and Sale." (T. 609).  The prosecutor asked what was the status of that case, and Mr. Perry stated that he was awaiting sentencing. (T. 609).  Mr. Perry then testified that he was "told" that his sentencing range was "no less than six to life and no more than ten to life." (T. 609).  Mr. Perry also testified that the first time that he had spoken to the prosecutor was the day before Perry testified. (T. 610).

On cross examination, defense counsel asked Mr. Perry if he was "making a deal ... ." (T. 620).  Mr. Perry simply stated: "No." (T. 620).  Defense counsel followed up by asking whether Mr. Perry was "selling out", to which Mr. Perry again responded: "No." (T. 620).  After an objection by the prosecutor, defense counsel asked: "You haven't made a deal with the prosecutor?" (T. 620).  Mr. Perry then stated that "I just told you, they told me the Judge told me no less than six and no more than ten." (T. 620-21).  Defense counsel then asked Mr. Perry: "Now if you give testimony, what part do you think you are going to get?" (T. 621).  Mr. Perry stated that: "It don't [sic] matter, six or ten, and I got to go do it and let's do it." (T. 621).

Defense counsel kept asking questions relative to the alleged deal.  He asked

Mr. Perry what he expected to "get" for his testimony, and Mr. Perry stated that he

would leave the Justice Center, "go to Elmira, finish and come home." (T. 621).

Mr. Perry also stated that he could not go to state prison until he had been

sentenced, and that the sentence was being held up "for this right here." (T. 622).

Petitioner argues that Mr. Perry lied because he testified that the only benefit

that he received for his testimony was transfer to a state facility.  A reading of the

transcript shows, however, that Mr. Perry did not restrict his statements to what

petitioner claims.  The statement regarding being transferred to Elmira was made

because Perry admitted that he was promised that he would be sentenced *after* he

testified in petitioner's case, and Perry could only be sent to Elmira, a state facility,

*after he was sentenced*.  Perry was telling defense counsel that he was anxious to

start his state sentence and get it completed, whatever the sentence was.  He also

admitted *several* times that he was told that he would get either six to life or ten to

life.  In fact, when defense counsel started his questioning, he asked Perry why he

was testifying, and Perry stated that "One, because [sic] sent me across the street,

and I got to go to State for ten years, and I might as well start it and, two, because of

greed and selfishness, got me here, and three, I got subpoenaed." (T. 620).

It was clear in the transcript that, although Mr. Perry stated that he was not

"making a deal" or "selling out," he *did* testify that he expected to get a particular

19

sentence if he testified, and that is all that the prosecutor stated that had been promised to him.  It is unclear what "perjury" or false testimony there was for the prosecutor to correct.  Before the court applies the factors outlined above, there must be misconduct by the prosecutor in the first instance in order to determine whether the misconduct caused prejudice, whether corrective measures cured the misconduct, and whether there would have been a conviction without the misconduct.  If there is no misconduct, a court need not apply the above factors.

Defense counsel in this case knew from the prosecutor's statements at pretrial oral argument that the sentencing promise ***was the only promise*** that had been made to Perry.  It was clear from Mr. Perry's testimony that he had been told that he was going to get a particular sentence and that he would not get sentenced until he testified.  The jury was not misled regarding his agreement with the prosecutor.  Mr. Perry simply did not use or wish to use the word "deal," and when defense counsel pressed him on this terminology, Mr. Perry simply stated that he already told counsel that he was going to get either six or ten to life.  Thus, petitioner's statement that the prosecutor committed some misconduct when he failed to "correct" Mr. Perry's false statement is unsupported, and the Appellate Division did not base its decision on an unreasonable determination of the facts, nor did it act contrary to federal law or unreasonably apply federal law in rejecting petitioner's claim of

prosecutorial misconduct.  Petitioner's second claim may be dismissed.

**5.**      **Presence at Sidebar Interviews of Prospective Jurors**

Petitioner argues that he was not allowed to be present at sidebar interviews of prospective jurors.  Petitioner claims that even though his attorney told the trial court judge that petitioner did not wish to be present, the trial court should have addressed petitioner directly in order to obtain a knowing and voluntary waiver of this right.  The Appellate Division clearly decided this issue on the merits, and therefore, the AEDPA standard applies.

The well-settled Supreme Court precedent states that a criminal defendant has a federal constitutional right under the Confrontation Clause of the Sixth Amendment and the Due Process Clauses of the Fifth and Fourteenth Amendments to be present at all stages of the trial "where his absence might frustrate the fairness of the proceedings." *Tankleff v. Senkowski*, 135 F.3d 235, 246 (2d Cir. 1998) (quoting *Faretta v. California*, 422 U.S. 806, 819-20 n.15 (1975))(internal quotation marks omitted), *cited in Sanchez v. Duncan*, 282 F.3d 78, 81 (2d Cir. 2002).  The impaneling of the jury is one of those trial stages. *Id.*

In this case, prior to the jury voir dire, the judge addressed himself to defense counsel and asked whether petitioner wished to participate in bench conferences. (T. 6).  Counsel responded: "No, your honor." (T. 6).  There was no further

21

discussion.  Petitioner argues that the trial court judge had a duty to address petitioner personally in order to obtain a valid waiver of petitioner's constitutional right.  The Appellate Division rejected petitioner's claim that his attorney's statement to the court that petitioner did not wish to participate was an ineffective waiver. 280 A.D.2d at 956, 721 N.Y.S.2d at 200.

The court in *Sanchez* questioned whether the petitioner had any more than a New York statutory right to be present at sidebar conferences with prospective jurors. 282 F.3d at 81-82.  The court cited various New York State cases holding that the New York rule, articulated in *People v. Antommarchi*, 80 N.Y.2d 247 (1992), is ***not*** compelled by federal law. *Sanchez*, *supra*.  Without specifically deciding the issue, the court in *Sanchez* held that any error related to petitioner's absence from the bench at sidebar conferences was harmless. 282 F.3d at 82.

Very recently, Judge John Gleeson of the Eastern District of New York discussed *Sanchez* and expressed his own doubts that the right to be present at sidebar jury voir dire conferences was a federal right. *Rodriguez v. Herbert*, 02-CV-895, 2004 U.S. Dist. LEXIS 8982, *15-21 (E.D.N.Y. May 20, 2004).  Judge Gleeson also stopped short of holding that the right was not federally protected and also held that any error in that petitioner's case would have been harmless. *Id.* Judge Gleeson, however, went one step further.  He held that the petitioner ***waived***

any right he had to be present at the sidebar conferences. *Id.* at *20-21.  The court held that although petitioner did not ***expressly*** waive his right to be present, he made an "implied waiver of the right through his conduct." *Id.*

In this case, the Appellate Division based its decision on the fact that petitioner waived his right through counsel.  Based on *Sanchez* and *Rodriguez*, this court finds that the Appellate Division's decision was not contrary to, nor did it involve an unreasonable application of federal law.  There is no federal law that states that the judge would have to address petitioner personally in order for his waiver to be valid, in fact, based upon the statement in *Rodriguez* that a petitioner could waive his right by "conduct", it is evident that the court did ***not*** have to address petitioner personally under the circumstances.  The trial court in this case ***clearly*** asked counsel ***in petitioner's presence***, whether petitioner wished to participate in the sidebar conferences, and counsel stated that petitioner did not wish to do so.  Petitioner did not object, and there was no further discussion of the issue.  Thus, the Appellate Division's decision did not violate the AEDPA standard, and petitioner's third claim may be dismissed.

## 6.   <u>Jury Instructions</u>

Petitioner argues that the court failed to instruct the jury at various times that they should not discuss the case amongst themselves or with anyone else.  The

Appellate Division found that this claim as well as an evidentiary claim that he does not bring in this application, were "not preserved for our review (*see, CPL 470.05[2]*) and in any event are without merit." 280 A.D.2d at 957, 721 N.Y.S.2d at 200.  Based on this language, it is clear that the Appellate Division did ***not*** decide this issue on the merits. *Zarvela v. Artuz*, 2004 U.S. App. LEXIS 6683, No. 03-2710, slip op. at 2690 (2d Cir. April 7, 2004).

A state prisoner who has procedurally defaulted on a federal claim in state court is entitled to federal habeas review of that claim only if he can show both cause for the default and actual prejudice resulting from the alleged violation of federal law, *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), or establish that failure of the court to consider the claim will result in a miscarriage of justice. *Id.* at 748.  A miscarriage of justice will have occurred if the constitutional violation has "probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

In this case, petitioner has shown neither cause, nor prejudice for his default. Additionally, he has not shown that he is "actually innocent" of the crime for which he was convicted.  Thus, petitioner's fourth claim may be dismissed.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the petition be **DENIED** and **DISMISSED.**

24

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: June 3, 2004

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge